Electronically Filed: 8/21/2023 4:57 PM

STATE OF MAINE                          SUPERIOR COURT
PENOBSCOT, ss.                          CIVIL ACTION
                                        DOCKET NO. PENSC-CIV-2023- 00116

IRVIN W. McKAY and CINDY L. McKAY

      PLAINTIFF

  v.

FAY SERVICING, LLC

      DEFENDANT

## COMPLAINT

### I.    VENUE.

1. Venue is appropriate as Plaintiffs are residents of the Town of Kenduskeag in Penobscot

   County and Defendant committed the acts complained of within Penobscot County.

### II.    PARTIES.

2. Plaintiffs Irvin W. McKay and Cindy L. McKay are residents of the Town of Kenduskeag,

   County of Penobscot and State of Maine. Sometimes Irvin W. McKay is referred to in this

   Complaint simply as "McKay" and together Irvin W. McKay and Cindy L. McKay are

   sometimes referred to as "the McKays."

3. Irvin McKay and Cindy McKay have at all material times occupied the property that is the

   subject of the Mortgage Loan identified below as their principal residence (the "Property").

4. Defendant Fay Servicing LLC is a corporation organized and existing under the laws of the

   State of Delaware, registered to do business in the State of Maine (hereafter referred to as

   "Fay").

1

### III.   FACTS REGARDING THE MCKAYS.

5. The McKays purchased their home in Kenduskeag, Maine that is the subject of this action in February 1983 and have lived there for over 39 years, years.

6. With respect to the mortgage loan received by the McKays in 2007 and that is the subject of this action, and which is serviced by Fay as discussed below, Irving McKay alone is liable on the promissory note evidencing that mortgage debt, and Irvin McKay and Cynthia McKay executed the mortgage deed which secures the payment of that note.

7. Irvin McKay is 69 years old, was educated though the 10th grade, cannot read, and is retired due to physical disability, from his life-long work as an industrial painter.

8. Cynthia McKay is 65 years old, did not complete high school but later obtained a GED degree and obtained a certified nursing assistant degree and is retired from her work as a nursing assistant due to physical disability.

### IV.   FACTS REGARDING FAY

9. Fay is licensed as a debt collector to collect consumer debts in the State of Maine by the Maine Bureau of Consumer Credit Protection.

10. Fay regularly engages in the business of attempting to collect debts in the State of Maine.

11. Fay regularly engages in the business of enforcing mortgages securing debts and collecting such debts in the State of Maine.

12. Fay collects debts using the mails and telephone as instrumentalities of interstate commerce.

13. Fay regularly engages in attempts to collect debts alleged by Fay to be due to others than itself.

2

14. Fay is a "debt collector" as defined by the Maine FDCPA, 32 M.R.S. § 11002(6) &

11003(7)(C).

15. Fay is a mortgage servicer within the meaning of 14 M.R.S. § 6113.

16. Fay took over the servicing of the loan at issue in this case before November 29, 2019, at a

time when the loan at issue was in default.

17. At the time it took over the serving of the loan that is the subject of this complaint, Fay

began servicing the loan on behalf of U.S. Bank Trust National Association as trustee of

Citigroup Mortgage Loan Trust 2018-A.

18. Upon acquiring the servicing rights of the McKay Loan that is the subject of this action, Fay

treated the loan that is the subject of this action as being in default.

19. When the loan that is the subject of this action was sold by f U.S. Bank Trust National

Association as trustee of Citigroup Mortgage Loan Trust 2018-A to Goldman Sachs Mortgage

Company around May 12, 2022, Fay continued to service the loan for that assignee of the

mortgage.

When the loan that is the subject of this action was sold by Goldman Sacks Mortgage Company

to U.S. Bank Trust National Association as trustee for Legacy Mortgage Trust 2021-GS4

around January 26, 2023, Fay continued to service the loan for that entity and has

continued to service the loan to the date of this complaint.

## V.   THE MORTGAGE LOAN.

20. Irvin McKay and Cindy McKay are consumers who have lived in Kenduskeag, Maine at all

times relevant to this Complaint.

21. On August 6, 2007, the Irvin McKay and his wife, Cindy McKay, entered into a mortgage loan with Equifirst Corporation in the amount of $118,500.00 (hereafter "the Mortgage Loan" or the "McKay Loan") with respect to which Irvin McKay signed the mortgage note (hereafter "the Note") and Irvin McKay and Cindy McKay signed the mortgage deed (hereafter "the Mortgage").

22. The Mortgage Loan has been sold several times and the records of the Penobscot County Registry of Deeds show that U.S. Bank Trust National Association as trustee for Legacy Mortgage Trust 2021-GS4 is the present owner of the Mortgage Loan

## VI.   THE LOAN MODIFICATION
## AND MONTHLY PAYMENT AMOUNT CHANGES.

23. Around December 1, 2018, due to health issues and loss of employment income, Irvin McKay could no longer afford the monthly payments on the Mortgage Loan and the loan went into default.

24. As of July 13, 2020, U.S. Bank Trust National Association, not in Its Individual Capacity but Solely as Trustee for The CitGroup Mortgage Loan Trust 2018-A (hereafter U.S. Bank Trust") was the owner of and party entitled to enforce the Note.

25. As of July 13, 2020, Fay was acting as servicer for U.S. Bank Trust with respect to the Mortgage Loan.

26. On July 13, 2020, Fay sent Irvin McKay a letter inviting him to make six trial payments (the "Trial Payment Plan" or "TPP") and telling him that if he made the six trial payments, Fay would permanently modify his loan and reduce his monthly mortgage payments.

4

27. The TPP required McKay to make a single payment of $4,479.95 for the month of August 2020 and then five payments each in the amount of $936.59 for the months of September 2020 through January 2021.

28. The McKays sold personal possession in a yard sale conducted by them and otherwise sold assets to raise the required initial payment of $4,479.95 required by the TPP and made that payment.

29. The McKays made the remaining five trial payments on the TPP during the months in which they were due with the final payment made on or about January 13, 2021.

30. Fay sent to the Irvin and Cindy McKay a loan modification agreement dated January 15, 2021 (the "Loan Modification Agreement") for their execution in January 2021 which required execution by both Irvin McKay and Cindy Mckay, and the McKays promptly signed and returned the Loan Modification Agreement to Fay.

31. The Loan Modification Agreement called for the Irvin McKay to make monthly payments of principal and interest of $482.20 beginning on October 1, 2020 (during a time when he was still making their trial payment plan payments).

32. The Loan Modification Agreement provided that "As of November 1, 2020, the principal amount payable under the Note and Security Agreement is $100,000, consisting of the unpaid amount(s) loan to Borrower by Lender plus any interest and other amounts capitalized."

33. The Loan Modification Agreement did not list or state any other amounts due on the Mortgage Loan.

34. The McKays signed the Loan Modification Agreement on the understanding and condition that no other sums were owed on the Mortgage Loan other than the $100,000 stated balance plus accruing interest and amounts due for month escrows of tax and insurance payments.

35. After their final TPP payment of $936.59 made by McKay on or about January 13, 2020, the McKays began in February 2021 to make monthly payments of $645.92 comprised of principal and interest of $482.20, plus tax and insurance escrows pursuant to the Loan Modification Agreement.

36. In March 2021, Fay changed the monthly payment amount to $655.70 after changing the monthly escrow amount to $173.50.

37. For the months of March through December1, 2021, the McKays made monthly mortgage payments to Fay of $655.70 comprised of monthly principal and interest of $482.20 plus tax and insurance escrows of $173.50 in accordance with the Loan Modification Agreement.

38. Effective January 1, 2022, Fay changed the monthly payment amount for the Mortgage Loan to $645.53 due to a change in the escrow amount, and the McKays made monthly payments in that amount through the end of 2022.

39. Effective January 1, 2023, , Fay changed the monthly payment amount for the Mortgage Loan to $6636.24 due to a change in the escrow amount, and the McKays have made monthly payments in that amount to the present date.

## VII. THE WRONGFUL COLLECTION SUIT INSTIGATED BY FAY.

40. On or about January 8, 2021, Fay acting as acting as mortgage servicer for the Mortgage Loan, hired the law firm of Doonan Graves & Longoria, LLC, to sue Irvin McKay for money alleged to be due on the Mortgage Loan.

6

41. Fay caused the suit to be filed in the United States Distict Court for the District of Maine against Irvin McKay, naming U.S. Bank National Association as plaintiff in Case No. 1:21-cv-00013, alleging that McKay was in default under the Note allegedly for failure to make the payment due on October 1, 2019 "and all subsequent payments" (the "First Suit").

42. The First Suit asserted causes of action against Irvin McKay for breach of the note, money had and received, quantum meruit and unjust enrichment, but did not assert a cause of action for foreclosure.

43. In instructing the Doonan Graves & Longoria law firm to commence the First Suit, Fay ignored the fact that Irvin McKay had already paid to Fay, acting as servicer for U.S. Bank Trust, five payments due under his Trial Payment Plan, and the fact that Fay had offered to permanently modify the Mortgage Loan if McKay made all six TPP payments.

44. In connection with the First Suit, the attorneys hired by and acting on behalf of Fay, recorded in the Penobscot Registry of Deeds a false "Affidavit of Commencement of Foreclosure Pursuant to 14 M.R.S. § 6321," to which it attached a copy of the complaint in the First Suit, and in which affidavit the attorneys for U.S. Bank hired by Fay alleged that the complaint in the First Suit was a "foreclosure complaint with [sic] 14 M.R.S. §6321," even though the complaint in the First Suit does not contain any claim for foreclosure and does not include any claims for relief under the Mortgage.

45. In the First Suit, McKay filed a counterclaim against U.S. Bank Trust, Fay and the law firm of Doonan, Graves & Longoria, LLC alleging abuse of process as to all counterclaim defendants, alleging breach of the Maine servicer duty of good faith in 14 M.R.S. § 6113 by Fay, and asserting a cause of action for declaratory judgment against U.S. Bank Trust and the Doonan firm (hereafter "the Counterclaim").

7

46. Fay caused the Doonan Graves & Longoria attorneys to dismiss the Complaint they had filed in the First Suit on March 10, 2021, but the McKay Counterclaim remained pending.

### VIII.  THE FIRST SETTLEMENT AGREEMENT.

47. On April 27, 2021, Fay executed the Loan Modification Agreement which Fay had submitted to the McKays in January, and which they signed on February 4, 2021, and returned to Fay on that date.

48. The McKay Counterclaim was settled under the terms of a Settlement Agreement and Release of Claims finally dated May 21, 2021 (the "First Settlement Agreement") pursuant to which U.S. Bank Trust and Fay agreed to record a corrective document in the Penobscot Registry of Deeds correcting the false foreclosure affidavit, and to pay $13,000 in damages to Irvin McKay and pay his legal fees of $8,500 in return for his dismissal of the counterclaim and acknowledgement by McKay of the validity of the assignment of the Mortgage by Equifirst Corporation.

49. U.S. Bank Trust and Fay required Cindy McKay to be a releasor in the First Settlement Agreement even though she was not a party to First Suit and the counterclaim filed therein.

50. The First Settlement Agreement provided that "All provisions of the Note, Mortgage and Modifications…shall remain in full force."

51. The First Settlement Agreement did not provide for nor cause the addition to McKay's obligations under the Note, Mortgage and the Loan Modification Agreement of any attorney fees, litigation costs or other charges of any description.

52. The First Settlement Agreement included a mutual release of all claims then existing between the parties.

### IX. THE IMPROPER ACTIONS OF FAY FOLLOWING THE FIRST SETTLEMENT AGREEMENT AND BEFORE

**THE SECOND SUIT**

53. Notwithstanding the full and proper performance by McKay of the Trial Payment Plan and the monthly payments by McKay to Fay pursuant to the Loan Modification Agreement from and after February 2021, and notwithstanding the settlement of the McKay counterclaims under the terms of the First Settlement Agreement:

    a. Fay sent to McKay a mortgage statement dated May 10, 2021, showing, in addition to his regular monthly payment amount of $655.70, a "Recoverable Corporate Advances Balance" due of $700 comprised of a "Foreclosure Attorney Fee" of $350 and a "Litigation Costs" item of $350.

    b. Fay sent to McKay a mortgage statement dated June 10, 2021, showing, in addition to his regular monthly payment amount of $655.70, a "Recoverable Corporate Advances Balance" due of $4,409.08 which included "Litigation Costs" items amounting to $3,300 and other wrongful charges.

    c. Fay sent to McKay a mortgage statement dated July 10, 2021, showing, in addition to his regular monthly payment amount of $655.70, a "Recoverable Corporate Advances Balance" owed of $2,600.00 comprised of unknown and unidentified amounts.

    d. Fay sent to McKay a Payoff statement dated August 3, 2021, showing a "Recoverable Corporate Advances" due of $2,600.00 in addition to principal and accrued interest.

54. None of the amounts stated by Fay as due as enumerated in the previous subparagraphs of this section were owed by the McKays.

**X. THE SECOND SUIT, BY MCKAY AGAINST FAY, AND THE SECOND SETTLEMENT AGREEMENT.**

55. As a result of the above enumerated wrongful actions of Fay following the First Settlement Agreement, Irvin McKay commenced a suit in the United States District Court for the District of Maine on August 18, 2021 as Case Number 1:21-cv-326-JDL seeking recovery of damages for the violations by Fay of the Federal and Maine Fair Debt Collection Practices Acts (15 U.S.C. §§ 1692-1692p and 32 M.R.S. §§ 11001-11054), and the Maine servicer duty of good faith statute (14 M.R.S. § 6113) (hereafter the "Second Suit").

56. As a result of the Second Suit, on October 13, 2021, Fay and the McKays, through their respective counsel, agreed upon the terms of a Settlement Agreement (the "Second Settlement Agreement") and counsel for Fay agreed to prepare the settlement agreement.

57. Even though she was not a party to the First Suit, Fay required Cindy McKay to be a party to and releasor in the Second Settlement Agreement.

58. On November 3, 2021, Counsel for Fay sent to counsel for the McKays the final form of the settlement agreement for the Second Suit and counsel for the McKays sent it on to them for their execution.

59. The McKays executed the Second Settlement Agreement on November 17, 2021, and that agreement was executed on behalf of Fay on December 2, 2021.

60. As of the execution of the Second Settlement Agreement, the McKay loan account serviced by Fay was current and nothing more than that current balance was owed on the loan account.

61. Despite the wrongfulness of the First Suit, and despite the fact that terms of the Second Settlement Agreement did not include any provision for the McKays to pay litigation costs to Fay or U.S. Bank Trust for either the First Suit or Second Suit, Fay sent to the McKays a

Mortgage Statement dated December 11, 2021, showing that Fay had added to the Loan

Account the following charges:

    a.  Litigation Costs    $880.00

    b.  Litigation Costs    $45.50

and showing a "Recoverable Corporate Advances" balance owed of $925.00.

62. The McKays did not receive the December 11, 2021, Mortgage Statement until after

December 20, 2021.

63. On December 29, 2021, counsel for the McKays sent the December 11, 2021, Mortgage

Statement by email to Kevin Polansky, Esq. who was counsel for Fay demanding that Fay fix

the mortgage statement to remove the added $925.00 of "litigation costs."

64. By email dated January 3, 2022, Attorney Polansky informed McKays' counsel that he had

contacted Fay and that Fay had agreed to an immediate "correction" and to "reclassify" the

litigation fees as "non-recoverable."

65. As a result of the Second Settlement Agreement, the second suit was dismissed with

prejudice on December 29, 2021.

66. As a result of the Second Settlement Agreement being finalized, and as a result of counsel

for Fay notifying counsel for the McKays on January 3, 2022 that Fay had made a

"correction" to its assertion that litigation charges were "recoverable advances," the

undersigned attorney who had been representing the Mckays sent a letter to Fay and its

counsel dated January 3, 2022 notifying them that his representation of the McKays had

terminated since there had been "apparent resolution of all issues."

## XI. THE WRONGFUL ACTIONS OF FAY FOLLOWING
## THE SECOND SETTLEMENT AGREEMENT.

67. Notwithstanding the agreement of Fay in early January 2022 that its attempt to add litigation costs to the McKay Loan Account was wrongful after agreement was reached for the Second Settlement Agreement, Fay immediately began adding still more wrongful litigation costs to the McKay loan account in the following mortgage statements and resumed treating them as "recoverable advances" when it had already agreed that such costs should be treated as non-recoverable.

68. By a mortgage Statement dated February 10, 2022 sent by Fay to directly to Irvin McKay (and not to his counsel since his counsel had sent notice of termination or representation on January 3, 2021), Fay stated to McKay that Fay had added to the McKay Loan Account as of February 8, 2022 the following additional charges:

     a.  Litigation Cost $350.00

     b.  Litigation Costs    $350.00

     c.  Litigation Costs    $350.00

69. The Fay Mortgage Statement of February 10, 2022, shows that there was a "Recoverable Corporate Advances" balance due on the Loan of $1,050.00.

70. The "litigation costs" which Fay has added to the McKay loan account are the legal fees and expenses incurred by Fay in defending itself in the Second Suit and are not charges which it was permitted by the Note and Mortgage evidencing the Mortgage Loan to add McKay loan account a part of its servicing activity for the owner of the Mortgage Loan.

71. For every month after the February 10, 2022 Fay Mortgage Statement,  Fay has sent directly to the Irving McKay (and not to his counsel since his counsel had sent notice of termination

or representation on January 3, 2021) monthly mortgage statements showing there was a "Recoverable Corporate Advances" balance" due on the Loan of $1,050.00.

72. Nothing in the Note or Mortgage evidencing the McKay Loan, nothing the First Settlement Agreement, nothing in the Second Settlement Agreement and nothing in any other document or agreement, and nothing in any federal or Maine statute permitted Fay to add to the McKay Loan account any litigation cost associated with the defense by Fay of the claims asserted against Fay in Second Suit by Irvin McKay

73. The charge to the McKay Loan Account of the litigation costs totaling $1050.00 enumerated above in this Section of the Complaint was wrongful and no part of said Fay litigation costs was owed by the McKays.

## XII. THE PATTERN AND PRACTICE OF FAY
## IN WRONGFULLY CHARGING LITIGATION COSTS TO THE MCKAY LOAN
## AND ITS WRONGFUL TREATMENT OF SUCH COSTS AS RECOVERABLE.

74. In the preceding paragraphs of this Complaint, the McKays have enumerated multiple instances of wrongful charges by Fay to the McKay Loan account of charges for litigation costs.

75. In the preceding paragraphs of this Complaint, the McKays have enumerated multiple instances of Fay sending to the McKays of monthly mortgage statements treating wrongfully charged litigation costs as "recoverable" advances owed by the borrower.

76. Fay's pattern and conduct of wrongfully adding its litigation costs to borrower loan accounts and wrongfully treating such costs as "recoverable" advances owed by the borrower extends beyond the Fay's dealing with respect to the McKay Loan account to other loans serviced by Fay.

77. In the foreclosure case of *Vincent v. U.S. Bank Trust, N.A.,* United States District Court for the District of Maine Case Number 2:20-cv-00380-JAW, defendant Vincent filed a counterclaim alleging that plaintiff's lack of standing and violations of 11 U.S.C. § 324 and various other statutes, and in response, that plaintiff dismissed its complaint and settled Vincent's counterclaims under a settlement agreement requiring it to pay to Vincent the sum of $60,000 and pursuant to which all claims of U.S. Bank Trust, N.A. against Vincent were dismissed with prejudice and all liability on the loan at issue in that case was extinguished.

78. Before the settlement in the Vincent case was concluded, Fay took over the servicing of the Vincent mortgage loan and that settlement agreement was signed on behalf of that plaintiff by Fay Financial, LLC as its attorney in fact.

79. Following the first settlement in the Vincent case which had fully and finally extinguished all of her liability with respect to that loan:

    a. Fay Servicing sent to Vincent a monthly Mortgage Statement dated January 10, 2022 which added the following charge to the extinguished loan account:

        i. Foreclosure Attorney Fee       $1,925.00

        ii. Foreclosure Attorney Fee       $825.00

        iii. Litigation Costs       $16,797.98

    and showing "Recoverable Corporate Advances" owed of $51,267.48.

    b. Fay sent to Vincent a monthly Mortgage Statement dated February 10, 2022, which added the following charge to the extinguished loan account:

        Litigation Costs       $4,057.65

and showing "Recoverable Corporate Advances" owed of $55,345.13.

80. Nothing in the Vincent note or mortgage evidencing the Vincent Loan, nothing in any other document or agreement relating to the Vincent loan, and nothing in any federal or Maine statute permitted Fay to add to the Vincent Loan account any litigation cost associated with the defense by Fay of the counterclaims asserted by Vincent in the suit against Vincent after that Plaintiff dismissed all of its claims against Vincent.

81. The charge to the Vincent Loan Account by Fay of the litigation costs totaling well in excess of $20,000.00 enumerated above was wrongful and no part of said litigation costs were owed by the Vincent or properly chargeable to her extinguished loan.

82. The first settlement agreement in the Vincent case was signed on behalf of Fay Financial, LLC as attorney in fact for that plaintiff on December 16, 2021 by Michael Aiken as Senior Vice President and Associate General Counsel for Fay Financial, LLC.

83. Only two weeks before he signed the first Vincent settlement agreement on December 16, 2021, Mikael Aiken, also acting as Senior Vice President of Fay Servicing, LLC, had signed the McKay Second Settlement Agreement on December 2, 2021 settling the Mckay claims for Fay's wrongful post-settlement charges to the McKay loan account, but despite Aiken's signatures on both settlement agreements and despite his management role as Senior Vice President for both Fay entities, that was not enough to stop the pattern and practices of Fay Servicing, LLC in improperly charging its litigation costs to borrowers' loan accounts and its improper and wrongful practices of sending borrowers mortgage statements claiming that such charges were "recoverable advances" payable by the borrowers.

84. Following Fay's misconduct in the Vincent matter following the first settlement in that case, Vincent sued Fay for damages for its misconduct in charging unlawful fees to the extinguished Vincent loan account, and Fay's Senior Vice President, Michael Aiken signed a second Vincent settlement agreement on May 16, 2022 agreeing that Fay would cease such misconduct and to pay a settlement sum to Vincent, but even that was not enough to cause Fay to cease its wrongful pattern and practice as Fay has continued those practices on the McKay Loan.

85. Fay has engaged in a pattern and practice of violating the duty of good faith which it owed to the McKays as the servicer of the McKay Loan under 14 M.R.S. § 6113.

### XIII.   THE EMOTIONAL DISTRESS DAMAGES OF THE MCKAYS.

86. When the McKay's received the July 13, 2020, loan modification offer from Fay before the commencement of the First Suit, they were concerned about the requirement for an initial payment of $4,479.95 by August 1, 2020, but they were relieved about the possibility of being able to complete the modification reducing their monthly payments and being able to save their home.

87. To be able to make the initial TPP payment of $4,479.95 required by the loan modification offer, the McKays had to sell personal belongings to raise the money, even including among other things sale of the lawn mower they used to mow the grass at their home in Kenduskeag and a ring which Irvin McKay had gifted to Cynthia McKay many years earlier.

88. Having sold personal possessions to meet the first loan modification payment, the McKays continued to be hopeful about being able to save their home as they made the additional five trial payment plan payments due for the months of September through December 2020 and January 2021.

89. Once the McKays made the trial payment plan due for January 2021, they felt a great sense of accomplishment and hope for the future that would allow them to retain their home of 40 years and they were anxious to receive the final permanent loan modification agreement from Fay.

90. The McKays were shocked and devastated when, on January 24, 2021, a Penobscot County Deputy Sheriff came to their home in Kenduskeag and served Irvin McKay with the Summons and Complaint used by Fay and its attorneys to commence the First Suit.

73. The McKays were even more shocked and also outraged when they read the Complaint in the First Suit and realized that it appeared to not even acknowledge the loan modification offered by Fay and on which they had been paying for six months, and when they realized that Irvin McKay was even being accused of unjustly enriching himself during the time that he and Cindy McKay were working diligently to make the payments called for by the trial payment plan.

91. The shock and outrage of the McKays was increased when they realized that Fay and the lawyers hired by it had recorded in the Penobscot County Registry of Deeds a false "Affidavit of Commencement of Foreclosure," when the First Suit was not even a foreclosure action.

92. The service upon the Irvin McKay of the suit papers in the First Suit caused the McKays to suffer great fear that their trial plan payments had been for naught, and that Fay was determined to take their home from them  by any means, legal or not, and that they would be powerless to stop Fay because they had no economic resources left to pay for legal representation after having used their available funds to make the trial plan payments.

17

93. The commencement and pursuit of the First Suit by Fay and the lawyers hired by Fay caused great emotional distress for Irvin McKay and Cindy Mckay to the point where they gained weight, lost sleep, suffered constant interruption of thoughts with worries about the suit and about the possible loss of their home, became irritable with each other, and suffered bouts of tearfulness and other manifestations of the emotional distress.

94. The McKays agreed to settle the First Suit for a sum low for the degree of damage caused to them because they were anxious to quickly have the First Suit dismissed and were very anxious to actually have Fay sign the permanent loan modification which had been offered back on July 13, 2020, as part of the trial payment plan offer, but which Fay had withheld signing while negations regarding the settlement of the First Suit were ongoing.

95. After completion of the First Settlement Agreement, the Mckays felt relief from the emotional distress which they had been experiencing, and again felt hopeful that they would be able to keep their home of 40 years.

96. The relief which the McKays had felt after the First Settlement Agreement was completely destroyed and all of their emotional distress resulting from the was re-ignited and aggravated and compounded when Fay began sending new mortgage statements to Irvin McKay showing the additions of thousands of dollars of litigation expenses to the McKay loan account which they knew they could not afford to pay and which they saw as outrageous and unjustified since the First Suit itself was unjustified and wrongful.

97. The fears and worries of the McKays was further aggravated and compounded by their knowledge that, even though they came to be represented by counsel in the First Suit, even

the presence of that lawyer was not enough to prevent Fay from continuing its abusive

conduct.

98. Again, and even more strongly than before, it seemed to the McKays that Fay was

determined to take their house from them by any means, legal or illegal.

99. When the McKays sued Fay for these additional wrongful acts in the Second Suit, they again

agreed to settle that suit for less money than seemed fair because they wanted to avoid the

containing stress of litigation, they wanted the immediate written confirmation through the

terms in the Second Settlement Agreement that their loan was fully current and that they

really did not owe the additional money being claimed by Fay, and they wanted peace in

their lives and freedom from the continuing distress and worry caused by the conduct of

Fay.

100.    Following completion of their second settlement with Fay through the Second

Settlement Agreement, the McKays experienced some relief from the heightened emotional

distress caused by the actions of Fay which necessitated the Second Suit, but now they

remained wary and worried and concerned about whether Fay would honor that agreement

and the terms of that settlement.

101.    The lingering fears and doubts of the McKays proved to be well founded when,

following the completion of the Second Settlement Agreement, the McKays found out that

that Fay had sent the December 11, 2021, Mortgage Statement showing the addition by Fay

of new litigation costs to the McKay Loan Account of $925.00.

102.    This newly increased and aggravated emotional distress of the McKays was somewhat

ameliorated when they learned that the lawyer for Fay had raised the issue with Fay and

that Fay had agreed that the addition of the litigation costs was an error that Fay claimed to have corrected.

103.    The McKays were deeply concerned however, when, by letter of January 3, 2022, their lawyer advised Fay, and them, that his representation was complete and that Fay should communicate directly with the McKays in the future, because they feared that Fay would again abuse them by trying to make unlawful charges to their loan account or by other actions which might affect their ability to retain their home of 40 years at a point where they no longer had an attorney representing them and could not afford to pay for any future legal representation.

104.    Thus, the McKays were shocked, devastated and emotionally distressed to an almost unbearable degree when, in February 2022, Fay sent them the February 10, 2022, Mortgage Statement showing the addition three charges of $350 each for litigation costs, totaling $1,050.00 added to their loan account as "recoverable advances."

105.    The McKays receipt of that February 10, 2022, mortgage statement left them feeling desperate and helpless to do anything about the constant and now continuing abuses of Fay and left them feeling that not even lawsuits against Fay, their representation by counsel or anything else would ever stop Fay from its mortgage servicing abuses.

106.    The sending by Fay of the February 10, 2022 Mortgage Statement, followed by mortgage statements sent every month thereafter showing "recoverable balances" owed on the loan of $1050.00, taken on top of all of the previous misconduct of Fay described above, now has left the McKays in great fear even of receiving the mail from Fay each

month out of fear that they will receive new mortgage statements from Fay showing even

more unlawful and unaffordable charges to the McKay Loan account.

107.    The wrongful actions of Fay described above have now put the McKays in constant daily

fear and worry and distress as to whether another deputy sheriff will appear at their home

to serve new suit papers on them in a legal action initiated by Fay, even though they are

paying their monthly mortgage payments, just as they had paid the six trial payment plan

payments when the deputy sheriff came to their home to serve them with papers in the

First Suit on January 24, 2021,

108.    The ongoing emotional distress of the McKays, caused by the continuing and outrageous

misconduct of Fay, is acute and constant and has adversely affected their relationship, their

eating habits, their ability to sleep, and their ability to feel secure in their own home of 40

years to the point where the McKays have even been forced to consider selling their home

to pay off the mortgage serviced by Fay so as to avoid further abuse by Fay.

109.    While the emotional distress of the McKays for which their first two suits against Fays

was serious and severe, the actions of Fay described in this complaint have caused them

even greater emotional distress and worry and that distress has manifested itself with

physical symptoms and illness for the McKays.

### XIV.    THE CONDUCT OF FAY TOWARD THE MCKAYS IS OUTRAGEOUS AND THE RESULT OF RECKLESS INDIFFERENCE BY FAY TO THE RIGHTS OF THE MCKAYS.

110.    As alleged in the following paragraphs, the conduct of Fay as described above constitute

tortious conduct of Fay toward Irwin McKay and Cindy McKay.

111.    The ongoing conduct of Fay toward the McKays as described above is far more than

mere reckless disregard of the circumstances.

112.    The ongoing conduct of Fay toward the McKays is so outrageous that malice of Fay

toward the McKays can be implied.

### COUNT I—BREACH OF MAINE SERVICER DUTY OF GOOD FAITH
### 14 M.R.S. § 6113

113.    The McKays repeat and reallege and incorporate by reference the allegations of

paragraphs 1 thorough 112 above as if set forth fully in this Count III of the Complaint.

114.    Irvin McKay and Cindy McKay are obligors within the meaning of 14 M.R.S.

§ 6113(1)(D).

115.    The conduct of Fay described herein constitutes repeated failures by Fay to act in good

faith toward the McKays in the servicing of the McKay Loan in violation of the mandate of

14 M.R.S. § 6113(2) which required Fay to act in good faith in the servicing of the McKay

Loan.

116.    The conduct of Fay in violating the duty of good faith which it owed to the McKays has

resulted in actual damages to the McKays including, without limitation, legal expense and

emotional distress.

117.    The conduct of Fay described above evidences a pattern and practice of Fay in violating

its duty of good faith entitling the McKays to recovery of statutory damages not exceeding

$15,000.00.

118.    The conduct of Fay in violating the duty of good faith which it owed to the McKays

entitles them to recover their legal fees in this action.

22

**WHEREFORE**, Plaintiffs Irvin W. McKay and Cindy L. McKay pray for awards of compensatory damages as may be appropriate in the premises, statutory damages, and attorney fees and for such other and further relief as the court shall deem appropriate and for their costs.

## COUNT II
## NEGLIGENCE

119.    The McKays repeat and reallege and incorporate by reference the allegations of paragraphs 1 thorough 118 above as if set forth fully in this Count II of the Complaint.

120.    No contractual relationship existed between the McKays and Fay with respect to the servicing of the McKay Loan by Fay.

121.    As a result of the filing by the McKay of the counterclaim in the First Suit and the Second Settlement Agreement as to which Fay required Cindy McKay to be a party, Fay was on explicit notice that its wrongful actions in servicing the McKay Loan were a cause of serious emotional distress and damage to the McKays.

122.    Because Cindy McKay is an obligor on the Mortgage and because she will be equally damaged if the actions of Fay impair or destroy the ability of Irvin McKay to maintain the McKay Loan in current status, the wrongful actions of Fay in the servicing of the McKay Loan are equally damaging and equally a cause of emotional distress to Cindy McKay.

123.    Sometime not long before the loan modification process began in 2020, Fay Servicing, LLC took over the servicing of the McKay Loan from Caliber Home Loans, Inc.

124.    The McKays had no legal right or ability to object to Fay becoming the servicer of the McKay Loan.

125.    Even after all of the abuses of Fay described above, the McKays had no ability, legal or otherwise, to avoid having their loan serviced by Fay.

126.   It was at all times foreseeable to Fay that its misconduct in the servicing of the McKay

Loan as described above would cause injury, damage and emotional distress to the McKays.

127.   At all times material hereto, the McKays have exercised due care with respect to the

McKay Loan.

128.   Fay owed to the McKays a duty of due care in its servicing of the McKay Loan.

129.   Fay failed to exercise due care in its servicing of the McKay Loan

130.   Fay was negligent in its failure to exercise due care in the servicing of the McKay Loan.

131.   As a result of the negligence of Fay in the servicing of the McKay Loan, the McKays have

been damaged as alleged above.

132.   The ongoing conduct of Fay toward the McKays alleged above is so outrageous that

malice of Fay toward the McKays can be implied.

**WHEREFORE**, Plaintiffs Irvin W. McKay and Cindy L. McKay pray for awards of

compensatory damages and punitive damages as may be appropriate in the premises, and for

such other and further relief as the court shall deem appropriate and for their costs.

## COUNT III
## BREACH OF FIDUCIARY DUTY

133.   The McKays repeat and reallege and incorporate by reference the allegations of

paragraphs 1 thorough 118 above as if set forth fully in this Count III of the Complaint.

134.   The McKays have limited educations and are inexperienced in financial matters and in

how mortgage servicers conduct their business.

135.   Because the McKays had no right to choose and have no right to reject Fay as the

servicer of the Mortgage Loan, they were forced to place trust and confidence in Fay that, in

its maintenance of the loan account records for the Mortgage Loan and in its addition of

charges to the loan account, it would act honestly and in accordance with the terms of the

loan documents and not add fees and costs to the loan account incurred by Fay in

defending its own misconduct in the previous suits.

136.    There was great disparity of position and influence between the McKays and Fay in the

mortgage servicing relationship.

137.    Fay had the exclusive ability to make decisions about the additions to the loan account

for the Mortgage Loan of fees and charges and the Mortgage and Note do not provide to

the McKays any avenue to challenge or contest the actions and decisions of Fay in how it

handles the loan accounting for the Mortgage Loan.

138.    The actions of Fay in adding wrongful charges to the loan account for the Mortgage

Loan were outside of its regular and permitted duties in servicing the loan in that Fay was

attempting to recover from the McKays its own litigation costs incurred as a result of being

sued twice for its wrongful activities regarding the mortgage loan.

139.    The ongoing conduct of Fay toward the McKays alleged above is so outrageous that

malice of Fay toward the McKays can be implied.

   **WHEREFORE**, Plaintiffs Irvin W. McKay and Cindy L. McKay pray for awards of

compensatory damages a punitive damages as may be appropriate in the premises and for such

other and further relief as the court shall deem appropriate and for their costs.

### COUNT IV
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

140.    The McKays repeat and reallege and incorporate by reference the allegations of

paragraphs 1 thorough 132 above as if set forth fully in this Count II of the Complaint.

141.    A special relationship existed between Fay and the McKays in that Fay had the exclusive ability add fees and charges to the loan account for the Mortgage Loan, Fay had twice wrongfully added charges to the loan account and had agreed to stop doing so and the McKays had no way to reject Fay as a servicer of the Mortgage Loan or to seek redress for its wrongful acts in the servicing of the Mortgage Loan short of this lawsuit and the McKay's previous two lawsuits against Fay which failed to deter it from its continuing misconduct.

142.    Fay owed to the McKays a duty to avoid causing emotional harm to the McKays, especially after they were forced two times previously to sue Fay to stop its misconduct and especially after Fay knew that the McKays counsel in their previous two lawsuits against Fay had terminated his representation of them.

143.    Fay breached its duty to avoid causing emotional harm to the McKays and as a result the McKay have suffered and continue to suffer serious and severe emotional distress.

144.    The ongoing conduct of Fay toward the McKays alleged above is so outrageous that malice of Fay toward the McKays can be implied.

**WHEREFORE**, Plaintiffs Irvin W. McKay and Cindy L, McKay pray for awards of compensatory damages and punitive damages as may be appropriate in the premises and for such other and further relief as the court shall deem appropriate and for their costs.

DATED:  August 22, 2023

 /s/ Thomas A. Cox
Thomas A. Cox, Esq.,   Me. Bar No. 1248
Attorney for Plaintiffs
Irvin W. McKay and Cindy L. McKay

P.O. Box 1083
Yarmouth Maine 04096
(207) 749-6671

tac@gwi.net